# IN THE COURT OF APPEALS OF IOWA

No. 16-2084
Filed March 21, 2018

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**JEREMY ALLAN ANDERSON,**
      Defendant-Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

Jeremy Anderson appeals his conviction for second-degree sexual abuse.

**AFFIRMED.**

Benjamin J. Bragg of Bragg Law Firm, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Zachary C. Miller, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Vaitheswaran and Bower, JJ.

**DANILSON, Chief Judge.**

Jeremy Anderson appeals his conviction for second-degree sexual abuse, in violation of Iowa Code section 709.3 (2014).  He contends the district court erred in allowing two hearsay statements, and there is insufficient evidence to sustain the conviction.  The court did not err in concluding the statements fell within hearsay exceptions, and there is substantial evidence supporting the conviction.  We therefore affirm.

**I. Background Facts & Proceedings.**

Anderson and his then-fiancée were caring for a neighbor's two children on the afternoon of July 14, 2014.  The fiancée went into a back bedroom to console one of the children, leaving Anderson and six-year-old A.F. alone in the living room.  When the fiancée returned to the living room, Anderson was sitting cross-legged on the floor facing a cross-legged A.F.  The three continued to watch a movie.  The children's mother returned about two hours later.

About three hours after the mother's return, A.F. was preparing for a bath and came to her mother crying.  A.F. told her mother Anderson "stuck his finger" in her "pee-pee."  The mother got the girl dressed and took her to the emergency room (ER) to be examined.

At the ER, A.F. was examined by Nurse Practitioner Leeann Hoodjer.  Upon visual examination, Hoodjer noted A.F. had two abrasions or scratches at the vaginal opening, which she classified as consistent with a scratch from a fingernail.

On August 7, 2014, Waterloo Police Department Investigator Brice Lippert contacted Anderson and his fiancée and asked them come to the Waterloo

Police Department to answer questions. Anderson agreed to speak with the investigator and, over the course of his interview, Anderson's statements changed. Anderson first unequivocally denied any inappropriate contact with A.F. Later, he stated that if any touching occurred, it was accidental. Eventually, Anderson stated he and A.F. were on the floor wrestling when his hand slipped all the way down her pants and he did touch her vagina underneath her underwear.

Anderson was charged with second-degree sexual abuse. At the bench trial held on July 27 and August 5, 2016, A.F.—now eight years old—was asked if she knew why she was there. She responded, "Because a long time ago, something happened. . . . I got hurt." She testified she was sitting on the couch when Anderson's fiancée left the room to care for A.F.'s crying sibling. Anderson then came over to A.F. and started to tickle her. They fell off the couch and she was lying on top of Anderson. He continued to tickle her. She also testified:

> Q. When you say privates, what do you mean? A. My pee-pee.
> Q. And what comes out of your pee-pee? A. Um, pee, and it burnt when I went to the bathroom because it was red.
> Q. So he touched your pee-pee, not inside of it, but with— A. Yeah.
> . . . .
> Q. What did he touch your pee-pee with? A. His hand. His nail.
> Q. So he—he touched it with his fingernail? A. Uh-huh.
> Q. Is that a yes? A. Yes.
> Q. Did he scratch you with his fingernail? A. Yes.
> Q. Did it hurt when he scratched you? Is that a yes? A. Yes. After a couple minutes later, my mom came home and I told her.
> Q. Okay. Now, when [Anderson] was touching your pee-pee, did you say anything to him? A. I telled him to stop.
> Q. You told him to stop? A. Or quit tickling me, I think, and I think that's all that he did to me. I'm not sure—I think then we went

downstairs. [My sister] took a short nap and then she woke up and we played outside for a little and then mom came home.

A.F. testified, "I told my mom everything that happened, and when I got my bath, my privates started to hurt, so I told her and she said it looked red." When asked if she said "ow" when Anderson touched her, A.F. stated she did not remember because "I was really little."

A.F.'s mother testified that when she was getting the two children ready for their bath on July 14, A.F. was already undressed and she came to the bathroom door shaking and crying. Anderson made a hearsay objection to any testimony by the mother as to what A.F. stated and the district court ruled the statement was an excited utterance and admissible. The mother testified that A.F stated, "I just want you to know Jeremy stuck his finger in my va—in my pee-pee."

Anderson also objected to Hoodjer being allowed to testify as to what A.F. said to her at the ER. Hoodjer testified that as an ER medical care provider,[1] "You want to know exactly what brought [the patient] in because it totally affects how you assess them, how you question them, how you treat them, and how you diagnose them, and also, their disposition from the ER. Do they go home? Do they go someplace else?" Further, Hoodjer testified the information she needed to provide treatment included,

> I would want to know, you know, who it was. You can't send them home if it was someone that was in their home. I would want to know if it was a male or female because that depends on the type of sexual assault that can occur, and I want to know exactly what happened so I know if there was finger penetration, penis

---

[1] Hoodjer stated that at the hospital at which she is employed, "the nurse practitioners are the ones that see all of the sexual assaults, domestic abuses, rapes."

penetration, penetration of the anus. You need to know that whole history to do an accurate assessment of the patient.
Q. So knowing what specific acts were alleged, what specific body parts were involved, that would be pertinent to any sort of medical diagnosis and treatment? A. Exactly. You couldn't do your full assessment, treatment without knowing that part of it.

Finding adequate foundation had been provided, the district court overruled Anderson's hearsay objection.

Hoodjer then testified:

A.F. said the neighbor's boyfriend put his hands down her pants. In the E[R], the patient states, Jeremy put his hand down the front of my pants and poked my hole with his finger. He scratched me with his nail. Patient states he also put h[i]s hand down the back of her pants and tried to poke her butt.

Further, Hoodjer stated that upon physically examining A.F., "I saw two abrasions at the opening of her vagina and abrasions are—it's like a scratch."

Anderson testified he did not inappropriately touch A.F. He denied that his hand was ever in her pants. The following exchange occurred between Anderson and his attorney:

Q. And you—you did tell the officer that [A.F.] was jumping on you? A. Yes.
Q. And somehow, your hand may have accidentally slipped between her skin and underwear. Did you tell the officer that? A. Yes, I did.
Q. Is that what happened? A. No.
Q. Then why did you tell the officer that? A. I was just—I was afraid. I—I figured if I told him what he wanted me to say, he would just make it go away.

On cross-examination, the prosecutor and Anderson had this exchange:

Q. And it's your testimony today that at no point in time during that interaction did your hand go into her pants? A. That's correct.
Q. That you never made skin-to-skin contact with her? A. Correct.
Q. With her genitals at that point in time? A. Yes.

The prosecutor then asked about the contrary statements Anderson had made to the investigator:

> Q. You told him that—you know, that this happened when you were wrestling on the floor with [A.F.]; right? A. Yes.
> Q. And you were certain at that time when you were wrestling with [A.F.] that your hand went down the front of her pants; right? A. Yes.
> Q. And that it went—your hand went all the way down between her legs; right? A. Yes.
> Q. And that you touched her vagina with your finger right? A. That's what I said.
> Q. And so that whole interview with Investigator Lippert, when you were in the first room, that whole time you were talking to him, you were intentionally providing him with false information; right? A. Yes.
> Q. And now your testimony is that even when you were in the second room and you told him that this happened while you were wrestling with [A.F.], that you were also providing him with false information at that time; correct? A. Yes, I was just telling him what I thought he wanted me to say.

In finding Anderson guilty, the trial court wrote: "The testimony reflects that [Anderson] was tickling the victim when he put his hand inside her pants, between her underwear and skin and poked her vagina with his finger nail." The court found the contact was sexual in nature.

Anderson appeals. He contends the trial court improperly admitted A.F.'s hearsay statements via her mother and Hoodjer. Anderson also asserts there is insufficient evidence to sustain the conviction.

**II. Scope of Review.**

We review claims of inadmissible hearsay for correction of errors of law. *State v. Smith*, 876 N.W.2d 180, 184 (Iowa 2016). We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Turner*, 630 N.W.2d 601, 610 (Iowa 2001).

**III. Discussion.**

Our rules of evidence prohibit the use of hearsay, i.e., a statement made by one other than the declarant while testifying at trial when offered to prove the truth of the matter asserted. Iowa Rs. Evid. 5.801, .802. However, "not excluded by the rule against hearsay" are excited utterances and statements made for medical diagnosis or treatment. *See* Iowa R. Evid. 5.803(2), (4). "[T]he question whether a particular statement constitutes hearsay presents a legal issue." *Smith*, 876 N.W.2d at 184 (citation omitted).

***A. Excited Utterance.*** Anderson challenges the trial court's determination that the statement made by A.F. to her mother hours after the event constituted an excited utterance.

"A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is an excited utterance. Iowa R. Evid. 5.803(2). A court considers five factors to determine whether a statement qualifies as an excited utterance:

> (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*State v. Dudley*, 856 N.W.2d 668, 679 (Iowa 2014) (citation omitted).

The court observed;

> District courts should consider the time lapse between the event and statements to ensure the statements were not the product of conscious thought or reflection. However, it is permissible to allow a greater amount of time lapse for children who make the statements to a parent or other safe adult, at the soonest possible time after the abuse occurred.

*Id.* at 680 (citation omitted). "The exception for excited utterance 'presupposes that the declarant blurted out a remark while under the influence of the startling event, so that it is unlikely that the remark was the product of conscious thought or reflection, but was probably accurate.'" *Id.* (quoting Jay M. Zitter, Annotation, *When Is Hearsay Statement "Excited Utterance" Admissible Under Rule 803(2) of Federal Rules of Evidence*, 155 A.L.R. Fed. 583, 583 (1999)).

Here, the trial court ruled:

> Given the foundation that's now been laid by the State and in light of the fact that this is a witness of the age that she's at and I do think that this does meet the excited utterance exception, the witness has indicated that the child, who is a child—was a young child at the time, was shaking and crying in response to telling her this when the time came for her to undress and take a bath.

We agree that under the circumstances presented A.F.'s statement to her mother was an admissible excited utterance. We acknowledge that the statement to the mother was made some hours after Anderson touched her. But the child's statement was made at the time she felt pain—"when I got my bath, my privates started to hurt, so I told her." It was then the six-year-old child presented herself to her mother crying and shaking. We find it "unlikely that the remark was the product of conscious thought or reflection, but was probably accurate." *See id.*; *see also State v. Mateer*, 383 N.W.2d 533, 535 (Iowa 1986) (upholding a statement as an excited utterance, though made an hour or more after the event); *State v. Galvan*, 297 N.W.2d 344, 346 (Iowa 1980) (involving two days); *State v. Paulsen*, 265 N.W.2d 581, 586 (Iowa 1978) (two hours); *State v. Stafford*, 23 N.W.2d 832, 835-36 (Iowa 1946) (fourteen hours).

**B. Statement for Medical Diagnosis or Treatment.** Anderson next contends A.F.'s statement to Hoodjer as to the identity of the perpetrator was not required for purposes of medical diagnosis or treatment. Our supreme court recently discussed statements made for purposes of medical diagnosis or treatment:

> One exception to the rule against hearsay relates to statements made for the purposes of medical diagnosis and treatment. Iowa R. Evid. 5.803(4). This exception applies to
> > [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
>
> *Id.* The rationale for the exception is that statements made by a patient to a doctor for purposes of medical diagnosis or treatment are "likely to be reliable because the patient has a selfish motive to be truthful."

*Smith*, 876 N.W.2d at 185 (citation omitted).

Anderson objects to the nurse practitioner's testimony as to A.F.'s statement of identity, contending it was not necessary for diagnosis and treatment. In *Smith*, our supreme court addressed this issue in child abuse cases,

> While it is common for statements of identity made by victims of child abuse to be admitted under [Iowa Rule of Evidence] 5.803(4), the statements are not admitted simply because they fall within a category of statements made to doctors or medical personnel by victims of abuse. Instead, these statements are admitted only when there is evidence that the statements of identity were made by a child-abuse victim for purposes of diagnosis or treatment by a doctor or medical provider and the identity was pertinent to the diagnosis or treatment. Eliciting the identity of a perpetrator of child abuse can be a normal aspect of medical treatment and diagnosis for child abuse victims; however, the value of that information is established by the foundational testimony of the doctors and medical providers in each case, and that testimony explains the

pertinence of the perpetrator's identity to the diagnosis and treatment of the victim in the unique circumstances of each case. The need to establish foundation for the admission of evidence under rule 5.803(4) is compatible with the standard approach to the admission of evidence under most other rules of evidence. In other words, proper foundation must normally be established before evidence may be admitted.

*Id.* at 187 (citations omitted).

The district court considered the foundational requirements and determined,

[G]iven the fact that this is a trial to the bench, some of these issues are perhaps less keen than they would be if we were trying the matter to a jury. I certainly believe that the information that was provided by the child to the nurse practitioner in terms of what happened was—and how she felt and those types of things are necessary and pertinent to treatment and diagnosis and are admissible.

The issue concerning identity, I think the case has been made that the gender and whether that person was an adult in this—in a sex abuse case would be pertinent and helpful and useful for purposes of treatment. The specific identity is not necessarily . . . as important. That all having been said, again, this is a trial to the bench, and for that reason, I'm going to find that the testimony offered, including identity information, would be admissible.

We add the nurse practitioner explained the need for a full patient history to adequately do a full assessment, which included whether abuse had happened in the past and if it was by someone the child comes into daily contact with or someone they had just met. Thus, the identity of the alleged abuser and amount of contact with that individual may affect the extent or scope of the assessment. We find the trial court did not err in concluding the appropriate foundation was provided to admit the statement by A.F. to the nurse practitioner.

***C. Sufficiency of the Evidence.*** To convict Anderson, the State was required to prove beyond a reasonable doubt Anderson performed a sex act with

a child under the age of twelve. *See* Iowa Code § 709.3(1)(b). Thus, here, the State had to establish sexual contact between the finger or hand of one person and the genitals or anus of another person. *See id.* § 702.17(3). Anderson contends the State failed to prove the contact here was sexual in nature.

In *State v. Pearson*, the court ruled the State must prove sexual abuse on a case-by-case basis to determine if the defendant's conduct falls within the definition of sexual contact described in section 702.17. 514 N.W.2d 452, 455 (Iowa 1994). "The sexual nature of the contact can be determined from the type of contact and the circumstances surrounding it." *Id.* If no non-sexual purpose for the contact is discernible, then this demonstrates the sexual nature of the contact. *Id.*

Anderson argues any contact he had with A.F. was accidental and not sexual in nature. The district court found:

> Given the history of playful interactions between [Anderson] and the victim, the court is firmly convinced that the timing of this incident is not merely coincidence. Instead, the court is convinced the contact was voluntary and purposeful in nature, and [Anderson] took advantage of an opportunity he had alone with the victim to commit sexual abuse against her.
> Because the contact was not accidental, the court reviewed the record for any plausible non-sexual purpose for the contact and could find none. A.F. was around seven years old at the time of the incident, so any hygiene or bathroom related reasons seem to be out of the question and no evidence was submitted alleging these may have played a factor. Without such evidence, the court sees no plausible scenario in which the touching in question could be viewed as anything except sexual in nature.

Finding no reason to disagree with the trial court's findings and conclusions, we affirm.

**AFFIRMED.**